**The below described is SIGNED.**

**Dated: January 09, 2007** _____

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**



_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number:  06-22777 |
| **PAUL CLAYSON HANKS and** **JERILYN HANKS**, | Chapter 13 |
| Debtors. | |

## MEMORANDUM DECISION

Paul and Jerilyn Hanks (Debtors) filed a petition under chapter 13 of the Bankruptcy

Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

(BAPCPA),[1] and confirmation of the Debtors' proposed chapter 13 plan is pending before the

Court.  Because of a change in employment, the Debtors' current income reflected on their

Schedules I and J is substantially less than the income reflected on Amended Form B22C, and

their proposed plan seeks to return a correspondingly smaller amount to unsecured creditors than

the amount indicated on line 58 of Amended Form B22C.  The chapter 13 trustee filed an

objection to confirmation asserting that the proposed plan does not comply with the disposable

---

[1]     Future statutory references are to title 11 of the United States Code unless otherwise
noted.

income requirements of § 1325(b).  As a result of this dispute, the Court must decide the

meaning of the phrase "projected disposable income" in § 1325(b)(1)(B) and, in so doing,

determine which of the emerging BAPCPA case law's various interpretations of the phrase to

follow, if any.

The Court has now considered the evidence properly before it, the credibility of the

witness and the arguments of counsel, and has made an independent inquiry into applicable case

law.  As a result, the Court hereby issues the following Memorandum Decision adopting the view

that even though the Debtors' current income is substantially less than their pre-filing income,

Form B22C is dispositive with respect to an above-median debtor's required return to general

unsecured creditors.

## I.  FACTS

The Debtors' Amended Statement of Current Monthly Income and Calculation of

Commitment Period and Disposable Income (Amended Form B22C) indicates on line 58 that the

Debtors have a monthly disposable income of $666.78 that should be paid to general unsecured

creditors on a monthly basis for the five-year term of the plan.[2]  This produces a total return to

general unsecured creditors of $40,006.80.[3]  But the Debtors filed a "pot" plan proposing

---

[2]      Form B22C is the incarnation of the detailed statutory income and expense calculations
in § 101(10A) and § 707(b)(2) that are incorporated into chapter 13 by § 1325(b) for debtors with
incomes above the median income for their respective states (colloquially called "above-median
debtors").  The Debtors in this case are above-median debtors, and nobody has alleged that Form B22C
does not accurately capture the relevant provisions of the Bankruptcy Code.  Accordingly, and for ease of
reference, the Court will only discuss Form B22C with the understanding that it is merely a proxy for the
requirements of the statute.

[3]      Multiplying $666.78/month by 60 months results in a total return to general unsecured
creditors of $40,006.80.

payments of $222/month and a pro rata return of $4,480 to general unsecured creditors based

upon their original Schedules I and J showing only $222/month in actual disposable income.

The disparity between the figure on line 58 of Amended Form B22C and the surplus

income indicated on Schedule J results from a substantial reduction in income suffered by Mr.

Hanks both before and after the date of filing.  Mr. Hanks was released prepetition from his

employment as a computer programmer making "slightly over" $64,000/year in salary.  His

monthly gross income reflected on Amended Form B22C, which was a combination of severance

pay and unemployment, was listed as $4,040.14 while Mrs. Hanks' monthly gross income was

listed as $3,264.45.  On the petition date, the Debtors filed Schedules I and J indicating that Mr.

Hanks was only receiving $1,660/month in unemployment but was looking for work and that

Mrs. Hanks earned $3,257/month in gross wages as a cardiology technician.  Amended

Schedules I and J were filed the day before the confirmation hearing showing Mr. Hanks' new

employment with Clearplay as a contract "movie watcher" screening movies for inappropriate

content at the rate of 20 cents for each minute of a movie that he watches.  His anticipated future

income from this job is $1,934/month; Mrs. Hanks' anticipated income figures were unchanged.

Based on the income from Mr. Hanks' new job, Amended Schedule J listed actual surplus

income of $310/month.

The claims bar date in the Debtors' case was December 7, 2006, and $52,510.40 in

general unsecured claims were timely filed.  Thus, assuming none of these claims are ultimately

disallowed, a total pot of $40,006.80 would represent a 76% return to general unsecured

creditors.  But the Debtors indicated at the hearing that their budget could not support payments

of $666.78/month to their general unsecured creditors, and so the higher plan payment arguably

required by Form B22C would render the plan unfeasible.  Accordingly, the Debtors argue that

the income figures on Amended Form B22C are not an accurate representation of their actual

current income and that their plan should be confirmed at payments of $310/month.

## II.  DISCUSSION

The trustee does not dispute the accuracy of any of the Form B22C numbers supplied by

the Debtors, and neither of the parties challenges the proposition that the end result on line 58 of

Form B22C is the monthly amount to be paid to general unsecured creditors for the applicable

commitment period.  As such, the Court is called upon to determine solely whether, when the

trustee or the holder of an allowed unsecured claim objects to confirmation, deviations from the

Form B22C calculations are permitted resulting in a different return to unsecured creditors and, if

so, for what reasons.  This analysis involves the interplay between several related statutory

sections and the phrases "projected disposable income" versus "disposable income."

First, § 1325(b)(1)(B) provides that

> [i]f the trustee or the holder of an allowed unsecured claim objects to
> the confirmation of the plan, then the court may not approve the plan
> unless, as of the effective date of the plan—the plan provides that all
> of the debtor's **projected disposable income** to be received in the
> applicable commitment period beginning on the date that the first
> payment is due under the plan will be applied to make payments to
> unsecured creditors under the plan.

In turn, the immediately following § 1325(b)(2) states that

> **[f]or purposes of this subsection**, the term '**disposable income**'
> means **current monthly income** received by the debtor (other than
> child support payments, foster care payments, or disability payments
> for a dependent child made in accordance with applicable
> nonbankruptcy law to the extent reasonably necessary to be expended
> for such child) **less amounts reasonably necessary to be expended
> [as determined in accordance with § 707(b)(2)(A) and (B)]**—

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

The Debtors argue that Form B22C is not dispositive as to the amount that their plan must return to general unsecured creditors. Rather, they argue that although the artificial calculations in Form B22C are useful in arriving at the "applicable commitment period" in § 1325(b)(4), the amount to be paid to general unsecured creditors in this case should be determined based on actual future income because of the Debtors' "substantial and material change in circumstances." In the Debtors' view, and relying upon *In re Jass*,[4] requiring a return to general unsecured creditors of $666.78/month based on the historical income and statutory expense numbers utilized by Form B22C would render the word "projected" in § 1325(b)(1)(B) meaningless. The Debtors offered no explanation in oral argument as to why "substantial and material change in circumstances" was the appropriate standard for deviating from Form B22C to look at actual income, other than their logic that "we should base a debtor's ability to pay on his current income, not on a figure pulled from air based on his previous income."

---

[4]    340 B.R. 411 (Bankr. D. Utah 2006) (Thurman, J.).

Many courts have addressed the "projected disposable income" issue raised by the

Debtors' case, and two broad lines of authority have emerged on the subject. *In re Alexander*[5] is

emblematic of the minority view that Form B22C is dispositive with respect to an above-median

debtor's required return to general unsecured creditors. If an above-median debtor's current

monthly income minus the allowed expenses under § 707(b)(2)(A) and (B) results in a positive

number on line 58 of Form B22C, then that number is the minimum amount that must be paid to

general unsecured creditors on a monthly basis. If the line 58 number is negative, then no return

at all to general unsecured creditors is required. "[O]ne simply takes the calculation mandated by

§ 1325(b)(2) and does the math."[6]

Although the majority position opposes the reasoning of *Alexander* and relies heavily or

wholly on the alleged distinction between "disposable income" and "projected disposable

income," there is little agreement among the cases beyond that basic proposition. Some cases

essentially continue to use Schedules I and J as a matter of course to determine plan payments

and percentage returns for above-median debtors in accordance with pre-BAPCPA practice.[7]

Some either explicitly hold or otherwise suggest that the concept of good faith is a possible

determinant of the return to general unsecured creditors.[8] And some establish a presumption in

---

[5]    344 B.R. 742 (Bankr. E.D.N.C. 2006); *see also In re Farrar-Johnson*, 353 B.R. 224
(Bankr. N.D. Ill. 2006).

[6]    *Alexander*, 344 B.R. at 749.

[7]    *See, e.g.*, *In re Kibbe*, 342 B.R. 411 (Bankr. D.N.H. 2006); *In re Grady*, 343 B.R. 747
(Bankr. N.D. Ga. 2006).

[8]    *See, e.g.*, *In re LaSota*, 351 B.R. 56 (Bankr. W.D.N.Y. 2006); *In re Edmunds*, 350 B.R.
636 (Bankr. D.S.C. 2006). The parties in this case did not argue their positions on the basis of "good
faith" plan filing under § 1325(a)(3), and the Court does not address at this time whether the return to
general unsecured creditors is an element of good faith.

favor of using the Form B22C calculations unless a party in interest can demonstrate a substantial

change in the debtor's circumstances.[9]

After a thorough review of the Bankruptcy Code and the case law discussing the issue,

this Court is compelled to adopt the reasoning of *Alexander* and reject the majority position in all

its variations.  In doing so, the Court agrees with cases such as *Jass* that the language of

§ 1325(b), while complex, is unambiguous.  But the Court respectfully disagrees with the

majority's approach to the definition of the term "projected" and the weight ascribed to that one

word.  For example, some cases define the word "projected" to mean "to calculate, estimate, or

predict (something in the future), based on present data or trends."[10]  From this, they conclude

that because the word "projected" is "future-oriented," then it must necessarily follow that "[t]he

significance of the word 'projected' is that it requires the Court to consider both future and

historical finances of a debtor in determining compliance with § 1325(b)(1)(B)."[11]  But stating

that "projected" is a future-oriented word says nothing about the import of that word as used in

§ 1325(b)(1)(B).

To the contrary, application of this definition of "projected" actually argues against the

majority position.  Starting with the number on line 58 of Form B22C as the "present data" —

which relies on the underlying concepts of "disposable income" and "current monthly income"

— the statute then requires courts to "calculate, estimate, or predict" how much must be returned

---

[9]       *See, e.g.*, *Jass*, 340 B.R. 411; *In re Pederson*, No. 06-00635S, 2006 WL 3000104 (Bankr.
N.D. Iowa Oct. 13, 2006).

[10]      *Jass*, 340 B.R. at 415; *see also Edmunds*, 350 B.R. at 646.

[11]      *Jass* at 415-16.

to general unsecured creditors over the applicable commitment period.  In fact, this process is no

different than what courts used to do in pre-BAPCPA practice except that courts previously

calculated the plan return using the average, estimated, and fluid numbers in Schedules I and J

rather than the average, estimated, and partially standardized numbers in Form B22C.[12]  And

neither method is particularly realistic.[13]  In "projecting" a return to general unsecured creditors

under the BAPCPA for above-median debtors, this Court's view is that its new function is solely

to multiply the net "disposable income" figure as calculated on Form B22C by the applicable

commitment period.  No more, no less.

Several opinions in the majority line of cases give other reasons to support their holdings,

but none of these reasons individually or collectively is persuasive enough to overcome the plain

language of the statute.  First, even if the word "projected" needs to be given meaning in the

abstract to avoid it being mere surplusage, the Supreme Court has made clear that the "preference

for avoiding surplusage constructions is not absolute" and can be "offset by the canon that

permits a court to reject words as surplusage if inadvertently inserted or if repugnant to the rest of

the statute."[14]  Applying this principle to the present case, one word clearly should not be

---

[12]    It is for these same reasons that the phrases "as of the effective date of the plan" and "to
be received" in § 1325(b)(1)(B) do not support the majority's position as alleged by some cases.  *See,
e.g.*, *Kibbe*, 342 B.R. at 415; *cf. In re Fuger*, 347 B.R. 94, 98 (Bankr. D. Utah 2006) (Thurman, J.)
(recognizing that the old § 1325(b)(1)(B) required debtors to "*project* income into the future [over 3 to 5
years], and commit to pay that amount into the chapter 13 plan" rather than the "actual disposable income
received by the debtor, which could be a greater amount") (emphasis in original, internal quotes omitted).

[13]    *In re Rotunda*, 349 B.R. 324 (Bankr. N.D.N.Y. 2006); *see also In re Guzman*, 345 B.R.
640 (Bankr. E.D. Wis. 2006) (contrasting the "rear view mirror" of current monthly income with the
"crystal ball" view of current and future disposable income).

[14]    *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) (quoting *Chickasaw Nation v. U.S.*, 534
U.S. 84, 94 (2001)) (internal quotes omitted); *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26,
35 (1990) ("Our starting point is the language of the statute, but in expounding a statute, we are not

elevated in importance so as to gut an entire statutory scheme enacted by Congress.  In *In re Hardacre*, the court stated that current monthly income calculations would still be relevant at least to describe "the sources of revenue that constitute income, as well as those that do not,"[15] while the Debtors in the present case argued that "disposable income" is really just a determinant of the applicable commitment period in § 1325(b)(4).  Both of these views require the unjustifiable deletion of several pages of the Bankruptcy Code in the name of a single word.[16]

This Court also finds unpersuasive the various policy arguments set forth in some of the cases in the majority line that appear unsupported and conclusory, and seem rooted in the pre-BAPCPA Bankruptcy Code.  For example, *Grady* states that "[c]ertainly the proponents of BAPCPA did not intend to close the bankruptcy court doors to debtors who voluntarily, and in good faith, seek to repay creditors with the funds they actually have on hand each month."[17]  *Jass* talks about the fresh start policy of the Bankruptcy Code and the possibility that a contrary result "would essentially foreclose the potential for bankruptcy relief from a group of chapter 13

---

guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *In re Wagers (Redmond v. Wagers)*, - - - B.R. - - - -, 2006 WL 3411857 (10th Cir. BAP 2006) (discussing *Lamie*); *Alexander*, 344 B.R. at 752 ("The [chapter 13] system was not broken. Whether it can survive the changes mandated by BAPCPA remains to be seen.  But the court's job is to interpret the new statute as clearly written, not to nostalgically preserve the past by seizing on isolated words such as 'good faith' and 'projected' and inflating their meaning beyond justification.").

[15]      338 B.R. 718, 723 (Bankr. N.D. Tex. 2006).

[16]      The Court also disagrees substantively with the Debtors' argument regarding the purpose of the "disposable income" concept in § 1325(b)(2).  Disposable income is a net figure of current monthly income minus reasonably necessary expenses.  It is only the current monthly income aspect of that equation that is relevant to calculating the applicable commitment period.

[17]      *Grady*, 343 B.R. at 752.

debtors who are otherwise eligible for relief."[18]  And *In re Fuller* discusses how freezing income and expense calculations at a particular point in time makes "little sense" if the purpose of § 1325(b)(1)(B) is to make sure that a debtor is paying as much as possible each month over the life of the plan to the people to whom she is indebted.[19]

But what about the competing policies that are at play in the BAPCPA?  The court in *In re Ott* discussed the "lens" through which Congress apparently viewed debtors in enacting the BAPCPA, the creditor-friendly nature of most of the BAPCPA's provisions, and Congress' perception of abuse and lack of personal financial accountability on the part of debtors in bankruptcy.[20]  Whether justified or not, the result of Congress' efforts was "a law that is sometimes self-executing, inflexible, and unforgiving."[21]  It is not at all clear that Congress did not actually intend to keep people out of bankruptcy altogether if possible or perhaps to push them into individual chapter 11 cases, nor is it clear that a "fresh start" is still the overriding policy of the portions of the Bankruptcy Code at issue in this case.  Perhaps the concept of current monthly income is an expression of Congress' intent that debtors should attempt to resolve their financial difficulties outside of bankruptcy for a period of time before filing. Indeed, this view would jibe with the new prepetition briefing requirement in § 109(h)(1) that contemplates meaningful credit counseling and the performance of budget analyses within six

---

[18]    *Jass*, 340 B.R. at 417.

[19]    *In re Fuller*, 346 B.R. 472, 483 (Bankr. S.D. Ill. 2006).

[20]    343 B.R. 264 (Bankr. D. Colo. 2006).

[21]    *Id.* at 266.

months of filing as well as the requirement in § 521(b)(2) that the debtor file a copy of any debt

repayment plan developed during the prepetition counseling session.[22]

The *Fuller* court's unsupported assertion regarding the payment-maximization purpose of

§ 1325(b)(1)(B) is also unclear at best.[23]  In fact, a cursory review of the income exclusions and

expense deductions allowed under the BAPCPA suggests other purposes at work.  The income

aspect of the "disposable income" calculus specifically excludes such items as child support,

foster care, and child disability payments reasonably necessary for the child's care as well as

amounts required to repay 401(k) loans, benefits received under the Social Security Act,

payments to victims of war crimes, and payments to victims of international or domestic

terrorism.[24]  In turn, debtors may in appropriate circumstances deduct expenses for elder care,

care of disabled or chronically ill relatives, private school tuition, housing and utility expenses

---

[22]     *See also* § 502(k)(1) (allowing courts to reduce unsecured consumer creditors' claims by up to 20% if they "unreasonably refused to negotiate a reasonable alternative repayment schedule proposed on behalf of the debtor by an approved nonprofit budgeting and credit counseling agency"); § 547(h) (prohibiting avoidance of transfers "made as a part of an alternative repayment schedule between the debtor and any creditor of the debtor created by an approved nonprofit budgeting and credit counseling agency").

[23]     The Court is well aware of statements such as the one in the Purpose and Summary section of the BAPCPA House Report expressing the view that the means testing mechanism "is intended to ensure that debtors repay creditors the maximum they can afford."  H.R. 109-031, Part I, Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  But such statements are insufficient to overcome both the plain language of the statute and the statements' apparent conflict with other policies at play in the BAPCPA.

[24]     *See* § 1325(b)(2) (excluding "child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child" from the definition of current monthly income); § 1322(f) (stating that "any amounts required to repay [a loan described in section 362(b)(19)] shall not constitute 'disposable income' under section 1325"); § 101(10A) (excluding "benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity . . ., and payments to victims of international terrorism . . . or domestic terrorism" from the definition of current monthly income).

beyond actual incurred expenses, secured debts, and possibly charitable contributions up to 15

percent of annual gross income.[25]  Whatever policies are at work in these provisions and however

laudable they may be, they do not appear to further a goal of maximum repayment to all

creditors.  And all of this is to say nothing of the fact that "[o]ne of the aims of the means test

was to limit judicial involvement — and so judicial discretion — by making mechanical the

determination of abuse under section 707(b).  The means test in section 1325(b)(3) is meant to

have the same mechanical effect."[26]

    That said, § 1325(b)(3)'s incorporation of subparagraphs (A) *and* (B) of § 707(b)(2) does

provide courts with a very limited ability to adjust both income and expenses under

§ 707(b)(2)(B)(i) based on a showing of "special circumstances, such as a serious medical

condition or a call or order to active duty in the Armed Forces, to the extent such special

circumstances that [sic] justify additional expenses or adjustments of current monthly income for

which there is no reasonable alternative."[27]  Mr. Hanks presented credible testimony regarding

---

[25]    *See* § 707(b)(2)(A)(ii)(II) (allowing deduction of expenses "for care and support of an
elderly, chronically ill, or disabled household member or member of the debtor's immediate family" in
appropriate circumstances); § 707(b)(2)(A)(ii)(IV) (allowing deduction of expenses up to $1,500
annually per minor child "to attend a private or public elementary or secondary school" in appropriate
circumstances); § 707(b)(2)(A)(ii)(V) (allowing deduction for extra housing and utility expenses beyond
those outlined in the Internal Revenue Services' Local Standards in appropriate circumstances);
§ 707(b)(2)(A)(iii) (allowing deduction for certain secured debt payments); § 1325(b)(2)(A)(ii) (allowing
expenses of up to 15% of a debtor's annual gross income for qualifying "charitable contributions").  The
House of Representatives gave final approval to S. 4044, the Religious Liberty and Charitable Donation
Clarification Act, on December 6, 2006.  If signed by President Bush as expected, the new law would
overrule cases such as *In re Diagostino*, 347 B.R. 116 (Bankr. N.D.N.Y. 2006) and permit ongoing
charitable contributions by both above-median and below-median income debtors.

[26]    *Farrar-Johnson*, 353 B.R. at 229 (internal citation omitted).

[27]    Section 707(b)(2)(B)(ii), (iii), and (iv) sets forth additional documentation, attestation,
and monetary requirements that need not be addressed at this time.  Although the first two of these
requirements are not problematic when imported into the chapter 13 context, the monetary limits in

his job loss, employment search efforts, and the relative income at his new employment.  But

unfortunately, none of these things rises to the level of "special circumstances . . . for which there

is no reasonable alternative" as contemplated by the statute.  The statutory examples of serious

medical conditions and active military service, although not exhaustive, are instructive of the

kinds of "special circumstances" that would justify deviations from Form B22C under the

principle of *ejusdem generis*.[28]  Mr. Hanks testified to the possibility of obtaining roughly similar

employment to his prior computer programming job in the relatively near future, but even so,

"reasonable alternatives" may also exist in the form of a second job or overtime work for either

of the Debtors, a reduction in actual expenses, assistance from family, or the like.

Ultimately, it is not within this Court's power nor is it this Court's role to change

Congress' intentional policy choices or to save it from its inadvertent drafting errors.[29]  The

language of the statute is plain, and the conflicting policies at work in the Bankruptcy Code as

amended by the BAPCPA do not provide a useful guide for interpreting the phrase "projected

disposable income" in § 1325(b)(1)(B) in a different manner.  Although the Court certainly

appreciates the logic and desire of returning to a chapter 13 practice that more closely resembles

pre-BAPCPA practice, a harsh or even illogical result is not the same thing as an absurd result,

and this Court must therefore interpret the statute according to its own terms.  Accordingly, the

---

§ 707(b)(2)(B)(iv) may be troublesome in the chapter 13 context if applicable at all.

[28]     *See, e.g.*, *In re Ludwig*, 345 B.R. 310, 318 (Bankr. D. Colo. 2006) (discussing the
principle of *ejusdem generis* that "general terms are applied only to those things of the same general kind
or class as those specifically mentioned") (internal quotes and citation omitted).

[29]     *Lamie*, 540 U.S. at 542; *see also Farrar-Johnson*, 353 B.R. at 229 ("It is not the courts'
place to rewrite the statute, turning it into something they consider more logical, sensible, or conducive to
human progress and enlightenment.").

Court must deny confirmation of the Debtors' proposed plan without prejudice.[30]  The Debtors

will have 45 days in which to file an amended plan and set a continued confirmation hearing, or

the case shall be dismissed.

### III.  CONCLUSION

It bears repeating that Congress' function is to legislate while the Court's function is to

interpret and apply the law as written instead of a law that the Court might find more logical or

reasonable.  Because of this principle and for the reasons set forth above, the Court is compelled

to hold that Form B22C is determinative of the return to general unsecured creditors for above-

median debtors unless "special circumstances" can be shown under § 707(b)(2)(B).  The Court

will issue an appropriate Order in accordance with this Memorandum Decision.

-----------------------------------------END OF DOCUMENT--------------------------------------------



---

[30]        The Court disagrees with those cases in the majority line that find further support for
their position in the mere existence of the postconfirmation modification provisions of § 1329.  What
may or may not be permitted following confirmation of a plan is not instructive on what must be done at
the actual confirmation hearing, and the Court takes no view at this time on the scope or extent of
permissible postconfirmation modifications.

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

Paul Clayson Hanks
Jerilyn Hanks
1198 North Colonel Road
Salt Lake City, UT  84116
        *Debtors*

Lee J. Davis
470 East 3900 South
Suite 105
Salt Lake City, UT  84107
        *Counsel for the Debtors*

J. Vincent Cameron
47 West 200 South
Suite 600
Salt Lake City, UT  84101
        *Chapter 13 Trustee*

United States Trustee
Ken Garff Bldg.
405 South Main Street
Suite 300
Salt Lake City, Utah 84111